

**FILED**

JAN 1 0 2020

JUDGE ANDREA WOOD
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

SULTAN ISSA

No. 19 CR 97

Judge Andrea R. Wood

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, JOHN R. LAUSCH, JR., and defendant SULTAN ISSA, and his attorney, DANIEL J. COLLINS, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The parties to this Agreement have agreed upon the following:

## Charge in This Case

2.     The information in this case charges defendant with wire fraud affecting a financial institution, in violation of Title 18, United States Code, Section 1343.

3.     Defendant has read the charge against him contained in the information, and that charge has been fully explained to him by his attorney.

4.     Defendant fully understands the nature and elements of the crime with which he has been charged.

## Charge to Which Defendant Is Pleading Guilty

5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the information, which charges defendant with wire fraud affecting a financial institution, in violation of Title 18, United States Code, Section 1343.

## Factual Basis

6.     Defendant will plead guilty because he is in fact guilty of the charge contained in the information. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt:

## Background

Individual A owned, controlled or otherwise held an ownership or beneficial interest in a group of related partnerships, corporations, and trusts for the benefit of Individual A and his family, with offices in Chicago, Illinois (collectively, the Individual A Family Office). A majority of the assets owned or controlled by the Individual A Family Office were housed at a single financial institution, hereafter referred to as Bank A, the deposits of which were insured by the Federal Deposit Insurance Corporation.

At relevant times, defendant SULTAN ISSA was a certified public accountant licensed in the State of Illinois and the Chief Financial Officer of the Individual A Family Office. In that capacity, ISSA acted as Individual A's personal financial advisor and was responsible for managing various financial and real estate

transactions, developing tax planning strategies and preparing tax returns for Individual A and the Individual A Family Office.

Pursuant to a power of attorney signed by Individual A, ISSA had the authority to make internal transfers among certain Individual A Family Office accounts at Bank A, subject to limitations. Under the power of attorney, ISSA was also authorized to make external transfers of up to $100,000 from a limited number of accounts, including accounts created to trade Initial Public Offerings (IPOs) on Individual A's behalf, with any trading profits to be split between ISSA and Individual A. These trading accounts included an account in the name of Hibiscus Capital LE IPO LLC (the Hibiscus Capital account), which was established in approximately 2010, and an account in the name of SR Trading LLC (the SR Trading account), which was established in approximately 2013.

ISSA also solicited investment funds from various individuals in his personal capacity and represented to these individuals that he would and did invest their money in legitimate investment opportunities, including securities, investment funds, and real estate and business ventures, including Seriously Automotive Group (d/b/a Global Luxury Imports), a luxury car dealership in Burr Ridge, Illinois, owned and controlled by ISSA.

### The Fraud Scheme

Beginning no later than 2010, and continuing through at least October 2017, ISSA devised, intended to devise, and participated in a scheme to defraud clients and

financial institutions, and to obtain money and property from those clients and financial institutions by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, which scheme affected a financial institution.

### Individual A and the Individual A Family Office

ISSA, without Individual A's knowledge or consent, forged Individual A's signature on powers of attorney and authorizations purporting to grant him authority to act as attorney-in-fact with respect to Individual A Family Office entities, assets, and accounts across multiple financial institutions. Pursuant to these forged authorizations, beginning no later than 2010 and continuing through at least October 2017, ISSA transferred tens of millions of dollars in funds and other financial assets belonging to Individual A and the Individual A Family Office into accounts under ISSA's control at Bank A, including the Hibiscus Capital and SR Trading accounts, and at other financial institutions where the Individual A Family Office had accounts and assets, without Individual A's knowledge or consent. ISSA then externally transferred funds from these accounts into accounts in his name and in the names of entities under his ownership and control at other financial institutions. By forging Individual A's signature on those authorizations and making those transfers, ISSA deceived multiple financial institutions, including Bank A, and caused them to provide funds to which he knew he was not entitled.

ISSA concealed the above unauthorized transfers by creating mirror accounts at other financial institutions using the same or similar account names as the Hibiscus Capital and SR Trading accounts located at Bank A. By using the same account names as the Bank A accounts, ISSA intended to make it appear as if funds were being transferred internally at Bank A, when in fact ISSA was transferring funds belonging to the Individual A Family Office and Bank A to accounts at other financial institutions under ISSA's ownership and control without Individual A or Bank A's knowledge or consent.

ISSA also made false representations to Individual A and Individual A's agents regarding the status of the Individual A Family Office assets, Individual A's personal financial status, and the amount of returns generated by ISSA's trading of IPOs through the Hibiscus Capital and SR Trading entities; in addition, ISSA intentionally created and provided to Individual A and his agents false and misleading account statements regarding the status of the Individual A Office assets.

Among the accounts of the Individual A Family Office from which ISSA fraudulently transferred funds was a trust account in the name of Individual A's mother that was used to pay her medical and other expenses while she was suffering from an incapacitating illness. ISSA knew of Individual A's mother's condition and the purpose of the trust account at the time he misappropriated funds from the account.

Financial Institutions

ISSA misappropriated funds from FDIC-insured financial institutions by providing false information in loan applications and supporting documents, including, but not limited to: false representations regarding ISSA's personal financial status and the financial status of entities owned or controlled by ISSA; forged and fraudulent tax documents; forged and fraudulent authorizations and other documents purportedly signed by Individual A or on behalf of Individual A Family Office entities; and forged and fraudulent pledges of collateral, in order to fraudulently obtain loans and extensions of credit for his own and his business entities' use and benefit.

By submitting fraudulent loan applications and other fraudulent materials to financial institutions, ISSA deceived financial institutions and fraudulently caused them to provide him and entities under his ownership and control loan funds and extensions of credit totaling tens of millions of dollars, knowing he was not authorized to obtain those funds or extensions of credit.

ISSA concealed his financial institution fraud by using funds and assets fraudulently obtained from Individual A and the Individual A Family Office and from other financial institutions to make down payments, to pledge as collateral, and to cover interest payments and expenses related to the fraudulently obtained loans and extensions of credit.

6

<u>Individual Investors</u>

ISSA solicited individual investors by representing that he would trade their investment funds, when in fact he intended to and did use the funds to benefit himself and his business entities, and to conceal his ongoing fraud against Individual A and the Individual A Family Office and against various financial institutions by replenishing funds misappropriated from Individual A and the Individual A Family Office accounts and making payments on fraudulently obtained loans and lines of credit.

ISSA also created and provided to investors and their families fraudulent account statements and correspondence, which contained false information concerning the clients' assets. ISSA falsely represented the status of investment portfolios of investors, including their performance and rate of return. ISSA knew that the investors' account statements were false and did not accurately represent the state of investors' assets.

In on or around April 29, 2016, ISSA fraudulently obtained $500,000 from Individual B following the death of her husband based on ISSA's false representations that he would invest these funds on Individual B's behalf when, in fact, ISSA intended to and did use these funds in furtherance of his ongoing scheme to defraud. At the time he fraudulently obtained these funds from Individual B, ISSA knew that Individual B was unusually vulnerable due to the recent loss of her husband.

7

As a result of the above-described scheme, ISSA caused a total intended and actual loss in excess of $65,000,000.

Use of Fraudulently Obtained Proceeds

ISSA used the funds fraudulently diverted from Individual A, the Individual A Family Office, and the financial institutions and individuals described herein to facilitate the scheme, and for his own and his business entities' use and benefit. ISSA's use of fraudulently obtained funds included but was not limited to the following:

*Personal Expenses and Property:* ISSA used tens of millions of dollars in fraudulently obtained funds to cover personal expenses and to acquire real and personal property for his own use and benefit and for the benefit of his business entities and family. ISSA used proceeds of the scheme to purchase and secure fraudulent loans relating to at least 25 residential properties in Illinois, Montana, Michigan, and Cabo San Lucas, Mexico; two private aircraft; four motor yachts; approximately 60 firearms; and assorted watches, jewelry and memorabilia. ISSA also used residential properties purchased with fraud proceeds as collateral to obtain loans and lines of credit from financial institutions.

*Business Expenses:* ISSA used over $15,000,000 in fraudulently obtained funds to pay expenses related to Seriously Automotive Group, including expenses related to the purchase and build-out of showroom space, the acquisition of luxury vehicles, and the salaries of employees.

*Ponzi-type Payments:* ISSA used a portion of the fraudulently obtained funds to make Ponzi-type payments to other individuals and financial institutions. For example, ISSA used funds misappropriated from the Individual A Family Office to make loan payments and service lines of credit that he had fraudulently obtained from financial institutions, and used funds fraudulently obtained from the Individual A Family Office and financial institutions to make payments to individual investors, which he falsely represented as legitimate investment returns.

<u>Interstate Wire</u>

On or about April 19, 2017, for the purpose of executing the scheme to defraud, ISSA knowingly caused to be transmitted in interstate commerce by means of wire communication an interstate wire transfer of approximately $150,000 from the SR Trading account at Bank A to an account under ISSA's control at another financial institution.

## **Maximum Statutory Penalties**

7.      Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.      A maximum sentence of 30 years' imprisonment. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation for this offense. This offense also carries a maximum fine of $1,000,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater.

Defendant further understands that the judge also may impose a term of supervised release of not more than five years.

b.     Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

c.     In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty or restitution imposed.

### Sentencing Guidelines Calculations

8.     Defendant understands that in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

9.      For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.      **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2018 Guidelines Manual.

b.      **Offense Level Calculations**.

i.      The base offense level is 7, pursuant to Guideline § 2B1.1(a)(1).

ii.      The base offense level is increased by 24 levels, pursuant to Guideline § 2B1.1(b)(1)(M), because the reasonably determinable loss amount as of the date of entry of defendant's guilty plea is in excess of $65,000,000 but less than $150,000,000. Defendant acknowledges that the reasonably determinable loss amount may increase between the date of the entry of defendant's plea and the time of sentencing.

iii.      The offense level is increased by 2 levels, pursuant to Guideline § 2B1.1(b)(2)(A), because the offense involved 10 or more victims.

iv.      The offense level is increased by 2 levels, pursuant to Guideline § 2B1.1(b)(10)(C), because the offense involved sophisticated means and

11

defendant intentionally engaged in or caused the conduct constituting sophisticated means.

      v.      The offense level is increased by 2 levels, pursuant to Guideline § 2B1.1(b)(17)(A), because the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense.

      vi.      The offense level is increased by 2 levels, pursuant to Guideline § 3A1.1(b)(1) because the defendant knew or should have known that one or more victims of the offense was a vulnerable victim.

      vii.      The offense level is increased by 2 levels, pursuant to Guideline § 3B1.3, because the offense involved the abuse of a position of trust.

      viii.      Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

      ix.      In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its

resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

      c.    **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

      d.    **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level is 38, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 235 to 293 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

      e.    Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing,

and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

10.    Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

## Agreements Relating to Sentencing

11.     Each party is free to recommend whatever sentence it deems appropriate.

12.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

13.     Regarding restitution, the parties agree that the total amount of restitution owed to the victims will be determined at the time of sentencing, minus any credit for funds repaid prior to sentencing, and that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant to make full restitution in the amount outstanding at the time of sentencing.

14.     Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

15.     Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

15

16.    Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

## Forfeiture

17.    Defendant understands that by pleading guilty, he will subject to forfeiture to the United States all right, title, and interest that he has in any property constituting or derived from proceeds obtained, directly or indirectly, as a result of the offense.

18.    Defendant admits that because the directly forfeitable property is no longer available for forfeiture as described in Title 21, United States Code, Section 853(p)(1), the United States is entitled to seek forfeiture of any other property of defendant, up to the value of the personal money judgment, as substitute assets pursuant to Title 21, United States Code, Section 853(p)(2).

19.    Defendant understands that forfeiture shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment. In this case, however, the United States Attorney's Office will recommend to the Attorney General that any net proceeds derived from any forfeited assets be remitted or restored to eligible victims of the offense pursuant to Title 18, United States Code, Section 981(e), Title 28, Code of Federal Regulations, Part 9, and other applicable law.

20.     Defendant agrees to waive all constitutional, statutory, and equitable challenges in any manner, including but not limited to direct appeal or a motion brought under Title 28, United States Code, Section 2255, to any forfeiture carried out in accordance with this agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel.

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

21.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 19 CR 97.

22.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

## Waiver of Rights

23.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.      **Right to be charged by indictment**. Defendant understands that he has a right to have the charge prosecuted by an indictment returned by a concurrence of twelve or more members of a grand jury consisting of not less than sixteen and not more than twenty-three members. By signing this Agreement, defendant knowingly waives his right to be prosecuted by indictment and to assert at trial or on appeal any defects or errors arising from the information, the information process, or the fact that he has been prosecuted by way of information.

b.      **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charge against him, and if he does, he would have the right to a public and speedy trial.

i.      The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove

18

prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

        iii.     If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt. The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

        iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

        v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

        vi.     At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.    At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

viii.    With respect to forfeiture, defendant understands that if the case were tried before a jury, he would have a right to retain the jury to determine whether the government had established the requisite nexus between defendant's offense and any specific property alleged to be subject to forfeiture.

c.    **Appellate rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction.

24.    Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

25.    Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the

nature, scope, and extent of defendant's conduct regarding the charge against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing.

26.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

27.     For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of

defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

### Other Terms

28.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

29.     Defendant understands that pursuant to Title 12, United States Code, Sections 1785(d) and 1829, his conviction in this case will prohibit him from directly or indirectly participating in the affairs of any financial institution insured by the National Credit Union Share Insurance Fund or the Federal Deposit Insurance Corporation, except with the prior written consent of the National Credit Union Administration Board or the FDIC and, during the ten years following his conviction, the additional approval of this Court. Defendant further understands that if he knowingly violates this prohibition, he may be punished by imprisonment for up to five years, and a fine of up to $1,000,000 for each day the prohibition is violated.

30.     Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## **Conclusion**

31.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

32.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

33.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

34. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

35. Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _____1- 10- 20_____

_____
JOHN R. LAUSCH, JR.
United States Attorney

_____
KATHRYN E. MALIZIA
Assistant U.S. Attorney

_____
SULTAN ISSA
Defendant

_____
DANIEL J. COLLINS
Attorney for Defendant

24

2020 JAN 13  AM 7:36