UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>SULTAN ISSA ) | Case No.: 19 CR 97<br><br>Judge Andrea R. Wood |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

The UNITED STATES OF AMERICA, by and through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits this position paper as to sentencing factors, and asks this Court to impose a sentence within the applicable Guideline range of 235 to 293 months' imprisonment.

**I.  BACKGROUND**

   **A.  Procedural History.**

On February 9, 2019, the United States Attorney filed an information against defendant, Sultan Issa ("ISSA"), charging him with wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343. (Docket No. 1). On January 10, 2020, ISSA pleaded guilty to the lone count of the information pursuant to a written plea agreement with the government. (Docket Nos. 25, 26). The Probation Office issued the presentence investigation report (hereinafter "PSR") on or about July 14, 2020. (Docket No. 48). On that same date, the Probation Office submitted its sentencing recommendation to the Court and disclosed that recommendation to the parties.

**B.    Offense and Relevant Conduct.**

The following is a summary of the facts of the offense and relevant committed by ISSA.  In a written plea agreement and a hearing held on January 10, 2020, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant admitted that the facts discussed below establish his guilt beyond a reasonable doubt. (Docket No. 26, at ¶6).

**Background**

Individual A owned, controlled or otherwise held an ownership or beneficial interest in a group of related partnerships, corporations, and trusts for the benefit of Individual A and his family, with offices in Chicago, Illinois (collectively, "the Individual A Family Office").  A majority of the assets owned or controlled by the Individual A Family Office were housed at a single financial institution (hereinafter "Bank A"), the deposits of which were insured by the Federal Deposit Insurance Corporation.

At relevant times, ISSA was a certified public accountant licensed in the State of Illinois and the Chief Financial Officer of the Individual A Family Office.  In that capacity, ISSA acted as Individual A's personal financial advisor and was responsible for managing various financial and real estate transactions, developing tax planning strategies and preparing tax returns for Individual A and the Individual A Family Office.

Pursuant to a power of attorney signed by Individual A, ISSA had the authority to make internal transfers among certain Individual A Family Office accounts at Bank A, subject to limitations.  Under the power of attorney, ISSA was also authorized to

make external transfers of up to $100,000 from a limited number of accounts, including accounts created to trade Initial Public Offerings (IPOs) on Individual A's behalf, with any trading profits to be split between ISSA and Individual A. These trading accounts included an account in the name of Hibiscus Capital LE IPO LLC (hereinafter "the Hibiscus Capital account"), which was established in approximately 2010, and an account in the name of SR Trading LLC (hereinafter "the SR Trading account"), which was established in approximately 2013.

ISSA also solicited investment funds from various individuals in his personal capacity and represented to these individuals that he would and did invest their money in legitimate investment opportunities, including securities, investment funds, and real estate and business ventures, including Seriously Automotive Group (doing business as "Global Luxury Imports"), a luxury car dealership in Burr Ridge, Illinois, owned and controlled by ISSA.

**The Fraud Scheme**

Beginning no later than 2010, and continuing through at least October 2017, ISSA devised, intended to devise, and participated in a scheme to defraud clients and financial institutions, and to obtain money and property from those clients and financial institutions by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, which scheme affected a financial institution.

<u>Individual A and the Individual A Family Office</u>

ISSA, without Individual A's knowledge or consent, forged Individual A's signature on powers of attorney and authorizations purporting to grant him authority

3

to act as attorney-in-fact with respect to Individual A Family Office entities, assets, and accounts across multiple financial institutions. Pursuant to these forged authorizations, beginning no later than 2010 and continuing through at least October 2017, ISSA transferred tens of millions of dollars in funds and other financial assets belonging to Individual A and the Individual A Family Office into accounts under ISSA's control at Bank A, including the Hibiscus Capital and SR Trading accounts, and at other financial institutions where the Individual A Family Office had accounts and assets, without Individual A's knowledge or consent. ISSA then externally transferred funds from these accounts into accounts in his name and in the names of entities under his ownership and control at other financial institutions. By forging Individual A's signature on those authorizations and making those transfers, ISSA deceived multiple financial institutions, including Bank A, and caused them to provide funds to which he knew he was not entitled.

ISSA concealed the above unauthorized transfers by creating mirror accounts at other financial institutions using the same or similar account names as the Hibiscus Capital and SR Trading accounts located at Bank A. By using the same account names as the Bank A accounts, ISSA intended to make it appear as if funds were being transferred internally at Bank A, when in fact ISSA was transferring funds belonging to the Individual A Family Office and Bank A to accounts at other financial institutions under ISSA's ownership and control without Individual A or Bank A's knowledge or consent.

ISSA also made false representations to Individual A and Individual A's agents regarding the status of the Individual A Family Office assets, Individual A's personal

4

financial status, and the amount of returns generated by ISSA's trading of IPOs through the Hibiscus Capital and SR Trading entities; in addition, ISSA intentionally created and provided to Individual A and his agents false and misleading account statements regarding the status of the Individual A Office assets.

Among the accounts of the Individual A Family Office from which ISSA fraudulently transferred funds was a trust account in the name of Individual A's mother that was used to pay her medical and other expenses while she was suffering from an incapacitating illness. ISSA knew of Individual A's mother's condition and the purpose of the trust account at the time he misappropriated funds from the account.

Financial Institutions

ISSA misappropriated funds from FDIC-insured financial institutions by providing false information in loan applications and supporting documents, including, but not limited to: false representations regarding ISSA's personal financial status and the financial status of entities owned or controlled by ISSA; forged and fraudulent tax documents; forged and fraudulent authorizations and other documents purportedly signed by Individual A or on behalf of Individual A Family Office entities; and forged and fraudulent pledges of collateral, in order to fraudulently obtain loans and extensions of credit for his own and his business entities' use and benefit.

By submitting fraudulent loan applications and other fraudulent materials to financial institutions, ISSA deceived financial institutions and fraudulently caused them to provide him and entities under his ownership and control loan funds and extensions of credit totaling tens of millions of dollars, knowing he was not authorized to obtain those funds or extensions of credit.

5

ISSA concealed his financial institution fraud by using funds and assets fraudulently obtained from Individual A and the Individual A Family Office and from other financial institutions to make down payments, to pledge as collateral, and to cover interest payments and expenses related to the fraudulently obtained loans and extensions of credit.

Individual Investors

ISSA solicited individual investors by representing that he would trade their investment funds, when in fact he intended to and did use the funds to benefit himself and his business entities, and to conceal his ongoing fraud against Individual A and the Individual A Family Office and against various financial institutions by replenishing funds misappropriated from Individual A and the Individual A Family Office accounts and making payments on fraudulently obtained loans and lines of credit.

ISSA also created and provided to investors and their families fraudulent account statements and correspondence, which contained false information concerning the clients' assets. ISSA falsely represented the status of investment portfolios of investors, including their performance and rate of return. ISSA knew that the investors' account statements were false and did not accurately represent the state of investors' assets.

In on or around April 29, 2016, ISSA fraudulently obtained $500,000 from Individual B following the death of her husband based on ISSA's false representations that he would invest these funds on Individual B's behalf when, in fact, ISSA intended to and did use these funds in furtherance of his ongoing scheme to defraud. At the time

6

he fraudulently obtained these funds from Individual B, ISSA knew that Individual B was unusually vulnerable due to the recent loss of her husband.

As a result of the above-described scheme, ISSA caused a total intended and actual loss in excess of $65,000,000.

Use of Fraudulently Obtained Proceeds

ISSA used the funds fraudulently diverted from Individual A, the Individual A Family Office, and the financial institutions and individuals described herein to facilitate the scheme, and for his own and his business entities' use and benefit. ISSA's use of fraudulently obtained funds included but was not limited to the following:

*Personal Expenses and Property*: ISSA used tens of millions of dollars in fraudulently obtained funds to cover personal expenses and to acquire real and personal property for his own use and benefit and for the benefit of his business entities and family. ISSA used proceeds of the scheme to purchase and secure fraudulent loans relating to at least 25 residential properties in Illinois, Montana, Michigan, and Cabo San Lucas, Mexico; two private aircraft; four motor yachts; approximately 60 firearms; and assorted watches, jewelry and memorabilia. ISSA also used residential properties purchased with fraud proceeds as collateral to obtain loans and lines of credit from financial institutions.

*Business Expenses*: ISSA used over $15,000,000 in fraudulently obtained funds to pay expenses related to Seriously Automotive Group, including expenses related to the purchase and build-out of showroom space, the acquisition of luxury vehicles, and the salaries of employees.

*Ponzi-type Payments*: ISSA used a portion of the fraudulently obtained funds to make Ponzi-type payments to other individuals and financial institutions. For example, ISSA used funds misappropriated from the Individual A Family Office to make loan payments and service lines of credit that he had fraudulently obtained from financial institutions, and used funds fraudulently obtained from the Individual A Family Office and financial institutions to make payments to individual investors, which he falsely represented as legitimate investment returns.

<u>Interstate Wire</u>

On or about April 19, 2017, for the purpose of executing the scheme to defraud, ISSA knowingly caused to be transmitted in interstate commerce by means of wire communication an interstate wire transfer of approximately $150,000 from the SR Trading account at Bank A to an account under ISSA's control at another financial institution.

## II. GOVERNMENT'S POSITION ON SENTENCING

For the reasons set forth below, a sentence within the advisory Guideline range of 235 to 293 months' imprisonment, is appropriate in this case and would be sufficient, but not greater than necessary, to reflect the sentencing factors set forth in 18 U.S.C. § 3553(a).

### A. **Properly Calculated Guideline Range.**

As a matter of process, the district court must properly calculate the Guideline range, treat the Sentencing Guidelines as advisory, consider the Section 3553(a) factors, and adequately explain the chosen sentence, including an explanation for any

variance from the Guideline range. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). As discussed below, it is the government's position that the Probation Office correctly calculated the defendant's advisory Guideline range under the November 2018 *Guidelines Manual*. (PSR ¶¶30-43, 48, 92).

    1.    *Base Offense Level*

Because the offense of conviction, 18 U.S.C. § 1343, has a statutory maximum term of imprisonment of 20 years or more, the Probation Office correctly noted that the base offense level is seven, pursuant to Guideline § 2B1.1(a)(1). (PSR ¶31). The parties agree on the application of this Guideline. (Docket No. 26, at ¶9(b)(i)).

    2.    *Specific Offense Characteristics – Loss Amount*

Pursuant to Guideline § 2B1.1(b)(1)(M), ISSA's offense level should be increased by 24 levels because the loss exceeds $65,000,000, but does not exceed $150,000,000. (PSR ¶32). There is no dispute between the parties regarding the application of this range of monetary loss. (Docket No. 26, at ¶9(b)(ii)). Based on information provided in the Government's Version of the Offense (hereinafter "GVO"), the Probation Office stated that the total actual loss stemming from ISSA's fraud is $85,030.257. (PSR ¶¶17, 20). Since the submission of the GVO, the parties have conferred in an effort to narrow any disputed issues regarding the total actual loss amount and associated restitution. The government does not anticipate that the parties' consultations will result in any change in the range of monetary loss specified in the written plea agreement, that is, $65,000,000 to $150,000,000. However, as discussed below in

Section II.D regarding restitution, the government anticipates a slight reduction in the total amount of restitution to the following: $83,961,557.

3. *Specific Offense Characteristics – Number of Victims*

The Probation Office correctly increased the offense level by two levels pursuant to Guideline § 2B1.1(b)(2)(A)(i) because ISSA's offense conduct involved 10 or more victims. (PSR ¶33). More specifically, ISSA's criminal misconduct caused more than 30 victims (including individuals and entities) to sustain losses. The parties agree on the application of this offense-level increase. (Docket No. 26, at ¶9(b)(iii)).

4. *Specific Offense Characteristics – Sophisticated Means*

The Probation Office correctly increased the offense level by two levels pursuant to Guideline § 2B1.1(b)(10)(C) because ISSA's offense conduct involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. (PSR ¶34). The parties agree on the application of this offense-level increase. (Docket No. 26, at ¶9(b)(iv)).

5. *Specific Offense Characteristics – Financial Institution Loss*

The Probation Office correctly increased the offense level by two levels pursuant to Guideline § 2B1.1(b)(17)(A) because ISSA derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of his offense conduct. (PSR ¶35). The parties agree on the application of this offense-level increase. (Docket No. 26, at ¶9(b)(v)).

6.   *Victim Related Adjustments – Vulnerable Victim*

The Probation Office correctly increased the offense level by two levels pursuant to Guideline § 3A1.1(b)(1) because ISSA knew or should have known that a victim of his offense conduct was a vulnerable victim. (PSR ¶36). In particular, ISSA raided a trust account in the name of Individual A's mother, which account was used to pay her medical and other expenses while she was suffering from an incapacitating illness. (Docket No. 26, at 5). The parties agree on the application of this offense-level increase. (Docket No. 26, at ¶9(b)(vi)).

7.   *Role in the Offense – Abuse of a Position of Trust*

The Probation Office correctly increased the offense level by two levels pursuant to Guideline § 3B1.3 because ISSA abused a position of private trust in a manner that significantly facilitated the commission or concealment of his offense conduct. (PSR ¶37). The parties agree on the application of this offense-level increase. (Docket No. 26, at ¶9(b)(vii)).

8.   *Acceptance of Responsibility / Timely Guilty Plea*

The Probation Office stated in the PSR that a two-level decrease pursuant to Guideline § 3E1.1(a) is warranted because ISSA has demonstrated acceptance of responsibility for the offense. (PSR ¶41). Moreover, the Probation Office stated in the PSR that a one-level decrease pursuant to Guideline § 3E1.1(b) is warranted because ISSA timely notified the government of his intention to enter a plea of guilty. (PSR ¶42). As a general matter, a "defendant is not entitled to an acceptance of responsibility reduction merely for pleading guilty." *United States v. Krasinski*, 545

11

F.3d 546, 554 (7th Cir. 2008). Nor is a defendant who enters a guilty plea entitled to an downward adjustment "as a matter of right." U.S.S.G. § 3E1.1, cmt. n.3. In deciding if a defendant is entitled to a reduction for acceptance of responsibility, a sentencing court may consider whether a defendant "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admitt[ed] . . . any additional relevant conduct"; voluntarily paid restitution before an adjudication of guilt; and voluntarily assisted authorities in recovering the fruits and instrumentalities of the offense. U.S.S.G. § 3E1.1, cmt. n.1(A), (C), (E); *see also United States v. Silvious*, 512 F.3d 364, 370 (7th Cir. 2008) (holding that a defendant was not entitled to reduction for acceptance of responsibility where he failed "to fully account for the proceeds of his crime and attempt[ed] to delay a long-scheduled hearing based on an incredible claim of innocence"); *United States v. Dillard*, 43 F.3d 299, 306 (7th Cir. 1994) (concluding that the defendant's conduct was inconsistent with acceptance of responsibility where he was less than truthful and did not give a complete statement of his involvement in the offense or account for the proceeds he received).

In the present case, the government agreed in the written plea agreement that it would not oppose these reductions, provided that it "does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1 . . . ." (Docket No. 26, at ¶9(b)(viii)). Pending its review of ISSA's sentencing submission, the government

does not presently anticipate a change in its position, as embodied in the written plea agreement.[1]

        9.    *Advisory Sentencing Guideline Range*

Assuming that the Court makes the downward adjustments discussed above, the government concurs with the Probation Office that ISSA's anticipated offense level is 38, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory Guideline range of 235 to 293 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

    **B.**    **Nature and Circumstances of the Offense and the Need for the Sentence Imposed to Reflect the Seriousness of the Offense.**

Within a few years of becoming the Chief Financial Officer of the Individual A Family Office, ISSA embarked on a years-long scheme characterized by rampant deception and unquenchable greed. ISSA's scheme was staggering in its scale, involving more than $100,000,000. Over the course of his scheme, ISSA used the ill-gotten gains for a variety of selfish purposes—none of which even remotely respected the authority entrusted to him as Chief Financial Officer of the Individual A Family Office. Rather, he funded an outrageously lavish lifestyle, acquiring multiple high-end

---

[1] The government acknowledges that victims Individual A and family members of Individual A have filed a sentencing submission in which they, among other things, urge this Court to withhold a reduction to ISSA's offense level for acceptance of responsibility. (Docket No. 50, at 30-33). As specified in the Crime Victims' Rights Act victims (or advocates on their behalf) have the "right to be reasonably heard at any public proceeding in the district court involving release, plea, *sentencing*, or any parole proceeding." 18 U.S.C. § 3771(a)(4) (emphasis added). As such, the government urges this Court to carefully review and consider the victims' sentencing submission. Nevertheless, at this time, government is not prepared to assert that evidence of

residences and investment properties, private jets, yachts, a luxury car dealership, jewelry, an extensive firearms collection, and a collection of Star Wars and NASA memorabilia.

While perpetrating his scheme, ISSA regarded no aspect of the Individual A Family Office or its many holdings as being off limits. If he felt constrained by the limits of a power of attorney issued to him by Individual A, he simply forged Individual A's signature on other powers of attorney to grant himself expanded authority to embezzle massive sums of money, which he then transferred into accounts that he controlled. He treated funds of the Individual A Family Office as though those funds were his own.

Moreover, not only did ISSA steal obscene amounts of money from the accounts of the Individual A Family Office, he leveraged a variety of assets associated with that entity to the hilt in order to obtain millions more through loans issued by various financial institutions. ISSA then used the loan proceeds to further fuel his decadent spending and thought nothing of encumbering countless assets of the Individual A Family Office. Consequently, Individual A and Individual A's family members will spend years unwinding ISSA's callous burdening of their assets.

Unfortunately, ISSA did not limit his relentless plundering to the Individual A Family Office. Instead, he ruthlessly manipulated relationships in every sphere of his life. Without hesitation, he victimized family members, neighbors, and even his son's

---

ISSA's acceptance of responsibility is "outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1, cmt. n.3.

baseball coach. Virtually anyone who came into contact with ISSA was a potential mark for his financial treachery.

While ISSA stands convicted of a single count of wire fraud affecting a financial institution, the true nature and circumstances of his offense conduct encompasses thousands of deceitful acts, dozens of victims, and tens of millions of dollars in losses. Under these circumstances, the Court should sentence ISSA within the advisory Guideline range of 235 to 293 months' imprisonment.

**C. History and Characteristics of the Defendant and the Need for the Sentence Imposed to Promote Respect for the Law, Afford Adequate Deterrence, and Protect the Public from Future Crimes by this Defendant.**

Regarding ISSA's history and characteristics, he has no criminal history to speak of aside from some minor traffic offenses. (PSR ¶49). In addition, ISSA possesses a graduate degree and has held state-issued licenses to perform work as a certified public accountant, as a real estate broker, and as a real estate salesperson. (PSR ¶¶75-77). He also has been steadily employed since 1995, including by the Individual A Family Office at a comfortable salary prior to his termination in October 2017. (PSR ¶¶78-82). These circumstances demonstrate that ISSA's principal motivation in engineering his colossal fraud scheme was insatiable greed. As discussed in the preceding subsection, ISSA spared no one from his avaricious pursuits, including those closest to him, such as members of his own family and his employer. ISSA's criminal conduct throughout his multi-year scheme overshadow any positive aspects of his personal history and reflect that his true characteristics are that of a cold-hearted and manipulative fraudster who lacks a moral compass.

15

Under these circumstances, the Court should impose a sentence within the advisory Guideline range of 235 to 293 months' imprisonment in order to promote respect for the law, to deter ISSA and others from engaging in similar misconduct, and to protect the public from future crimes by ISSA.

### D. The Need for the Sentence to Provide Restitution.

The offense of conviction is subject to the mandatory restitution provisions of 18 U.S.C. § 3663A. In the written plea agreement, the parties agreed "that the total amount of restitution owed to the victims will be determined at the time of sentencing" and that this Court "must order [ISSA] to make full restitution in the amount outstanding at the time of sentencing. (Docket No. 26, at ¶13). At the time of this submission, it is the government's position that the total amount of restitution owed by ISSA is $83,961,557, as allocated between the following categories of victims:[2]

| Victim Category | Restitution Amount |
| --- | --- |
| Individual A Family Office | $45,335,824 |
| Individual Investor Victims | $4,139,868 |
| Financial Institution Victims | $34,485,865 |
| **Total:** | **$83,961,557** |

With regard to the timing and source of restitution, the Seventh Circuit has held that there is a "preference" for immediate payment. *United States v. Hosking*, 567 F.3d 329, 335 (7th Cir. 2009). This preference for immediate payment is grounded in

---

[2] For purposes of this public filing, the government has anonymized the victims' names. Prior to the sentencing hearing scheduled for August 20, 2020, the government will submit to the Court, the Probation Office, and defense counsel a revised restitution schedule for incorporation into the judgment.

statutory text: "[T]he court is also required to craft its restitution order 'pursuant to 18 U.S.C. § 3572' . . . which provides that '[a] person sentenced to pay a fine or other monetary penalty, including restitution, shall make such payment immediately, unless, in the interest of justice, the court provides for payment on a date certain or in installments.'" *Hosking*, 567 F.3d at 335 (quoting 18 U.S.C. § 3572(d)(i)).

Here, to the extent ISSA does not have funds immediately available to satisfy the full restitution amount, a schedule of payments should be applied. In addition, the government respectfully requests that the following language be included in the judgment at sentencing as to the timing of payment:

> The Court further orders that the defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations. In addition, 10% of the defendant's future monthly disposable income shall be paid toward any remaining restitution or fine balance. Pursuant to 18 U.S.C. § 3664(k), the defendant must notify the court and the United States Attorney's Office of any material change in the defendant's ability to pay restitution.

### E. Duration and Conditions of Supervised Release.

With respect to the imposition of supervised release, the Court must: (1) make an independent determination that each condition imposed is rationally and reasonably related to the defendant's particular offense conduct and characteristics, and to the sentencing purposes identified by 18 U.S.C. §§ 3583(c) and 3553(a)(1), (a)(2)(C), and (a)(2)(D); (2) state the reasons for imposing each condition; and (3) ensure that each condition is simply worded and not broader than necessary to achieve the purposes of sentencing. *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015); *see also United States v. Siegel*, 753 F.3d 705, 716-17 (7th Cir. 2014); *United States v.*

17

*Shannon*, 743 F.3d 496, 500 (7th Cir. 2014) (citing 18 U.S.C. § 3583(d)). In light of defendant's particular offense conduct and characteristics, and the sentencing purposes identified by 18 U.S.C. §§ 3583(c) and 3553(a), it is the government's position that ISSA should be ordered to serve a term of supervised release of not less than three years. In addition, the government concurs with the Probation Office's recommended supervised release conditions. (PSR ¶¶94-96). The recommended conditions are tailored to facilitate supervision by the Probation Office and assist in encouraging ISSA's compliance with the law and deterring him from future crimes. Moreover, the conditions will support ISSA's rehabilitation and to help ensure that he is engaged in lawful pursuits rather than criminal activity, given his specific history and characteristics.

### III. CONCLUSION

Based upon the arguments and evidence discussed above, the government requests that the Court impose a sentence within the applicable Guideline range of 235 to 293 months' imprisonment to be followed by a term of three years' supervised release. In addition, the government requests that the Court order ISSA to pay restitution in the total amount of approximately $83,961,557 allocated between several designated victims.

                                        Respectfully submitted,

                                        JOHN R. LAUSCH, JR.
                                        United States Attorney

By:   */s/ Philip N. Fluhr*
       PHILIP N. FLUHR
       Assistant United States Attorney
       219 S. Dearborn Street, Fifth Floor
       Chicago, Illinois 60604
       (312) 886-1173

Dated: August 6, 2020