**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 19 CR 97 |
| | ) | Judge Andrea R. Wood |
| v. | ) | |
| | ) | |
| | ) | |
| SULTAN ISSA | ) | CONFIDENTIAL |
| | ) | **FILED UNDER SEAL** |
| | ) | |
| | ) | |

### <u>SEALED SENTENCING MEMORANDUM OF THE WESTON VICTIMS</u>

Roger L. Weston, Pamela Phillips Weston, Dr. Cynthia Weston, and Randall Weston ("the Westons"), by their attorneys, Gair Eberhard Nelson Dedinas Ltd., respectfully submit their Sealed Sentencing Memorandum pursuant to the provisions of Title 18, United States Code, Section 3771, Federal Rule of Criminal Procedure 32(d)(2) and the Order of this Court. This memorandum addresses the relevant sentencing factors under Title 18 U.S.C. § 3553(a). In addition, the Westons plan to address the Court directly concerning highly personal issues at the sentencing hearing.

### <u>OVERVIEW</u>

Sultan Issa worked as the financial officer of Roger Weston's family office. Over almost a decade, he engaged in a pattern of embezzlement and fraud directed against Roger Weston, his wife, Pamela Phillips Weston, and his siblings, Dr. Cynthia Weston and Randall Weston, and other family members, as well as many other victims.

The Westons suffered a loss of <u>over $60 million</u> in stolen funds at the hands of Issa just from his embezzlement from accounts at two banks, JP Morgan and UBS, <u>and another $70 million</u> from losing the appreciation and dividends on stocks the family had held for decades and that Issa

fraudulently pledged and caused to be liquidated. They face the possible loss of properties, including their family home and an art collection, that Issa fraudulently mortgaged to others for his own gain. They have already incurred ████████ in professional fees from being forced to prosecute lawsuits to recover their assets from those who facilitated the fraud and to fight off claims from third parties to whom Issa fraudulently conveyed their assets. They have suffered losses from having to pay off other victims who threatened to sue Mr. Weston.

The evidence, as laid out in this Memorandum, will demonstrate beyond any doubt that Sultan Issa is an inveterate and unrepentant liar, thief, con-man and sociopath whose victims include individuals—most of them elderly—banks, and others. We believe that the series of frauds committed by Sultan Issa is one of the largest ever prosecuted in this District. Most of the funds he stole are unaccounted for, and it is highly likely that he still retains access to them.

In addition, Issa has been caught red-handed committing <u>new frauds</u> in the over 2 ½ years since the Weston frauds were discovered and after he learned he was a target of a federal investigation, including frauds committed as late as the fall of 2019.

The Westons, all of whom are in their late sixties to late seventies, are devastated. The rest of their lives will be consumed with litigation. Roger Weston, the principal victim and head of the family, is tortured by the betrayal and spends virtually every waking moment thinking about it. His siblings have lost the vast majority of what they had for retirement.

The fraud committed by Issa was sweeping in its audacity, its duration, and its scope. The Westons respectfully recommend that the punishment be commensurate with the harm, and that this Court impose the maximum sentence authorized under 18 U.S.C. § 1343—**30 years imprisonment**. Any lesser sentence would deprecate the nature and seriousness of the offense

2

and the nature and characteristics of the offender, deny just punishment and put the public at large

at continuing risk of harm upon his release.

### ISSA'S SCHEME TO INSINUATE HIMSELF INTO THE WESTON FAMILY'S CONFIDENCE IN ORDER TO ABUSE THEIR TRUST

The Westons' financial losses are only part of the harm from the crimes Issa committed.

Issa abused his position of trust to commit the massive fraud against the Westons.  He acquired

that trust through years of diligently grooming and ingratiating himself with the family and through

phony professions of love for Roger Weston, his wife Pam, and others. Typical of Issa's emotional

manipulation of his victims is a letter he wrote to Mr. Weston on Father's Day 2014, in which he

told Mr. Weston, among other things:  "You are the most selfless man I have ever had the privilege

to know.  Whenever ██████ [Issa's wife] and I are conflicted with an issue, she always asks us

'What would Roger do?'" He goes on to say:

Issa's metaphor of the "genie" by his side is telling, if perversely inapt.  In fact, without

Roger Weston's knowledge, Issa appropriated Mr. Weston's wealth to grant himself every

avaricious wish of which he could conceive.  See also *infra* at p. 9 (Issa's email expressing "love" for Mr. Weston after Mr. Weston loaned Issa millions to buy a house).

The depths of Issa's moral depravity are illustrated by a note he wrote to Cynthia and Roger Weston after their beloved mother died at age 96 in 2015.  Issa had stolen millions from the Westons' mother as she was dying, but had the audacity to send this note:

> **From:** Sultan S. Issa CPA MST ▓▓▓▓▓▓▓▓▓
> **Sent:** Tuesday, October 27, 2015 8:01 AM
> **To:** Cynthia Weston, Prof. ▓▓▓▓▓▓▓▓▓
> **Cc:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
> **Subject:** Re: sad news
>
> Dear Cynthia
> We are all so sorry and our thoughts and prayers go out to you and the family. Your mom is resting peacefully with Arty boy now.
> We are all here for you...
> Love
> S
>
> Sultan S. Issa CPA, MST
> WESTON FAMILY OFFICE

Issa's warped scheme to insinuate himself into the heart of the family was so brazen, and so unspeakable, that he even gave two of his children the Westons' names, "Roger" and "Pam," as middle names, to convince the Westons of his devotion to them.

## THE DIRECT EMBEZZLEMENT FROM WESTON ACCOUNTS

Issa's embezzlement scheme lasted from no later than 2009 to 2017.  One huge component of his fraud consisted of directly embezzling tens of millions of dollars from Weston accounts held at JP Morgan and UBS.  Issa accomplished the JP Morgan account fraud through a series of means. For example, Issa created and submitted to the bank phony "authorizations" and other documents purportedly allowing Issa to transfer funds from Weston accounts.  Issa forged Roger Weston's signature on those phony authorizations and countless other documents and submitted them to the banks. Using these forged authorizations, Issa issued wire transfers or checks drawn on various of

4

the Westons' JP Morgan and UBS accounts, which he cashed or deposited into accounts he controlled at JP Morgan or other financial institutions in order to misappropriate the money for his own purposes.

Beyond using completely forged authorizations, Issa also violated and abused the terms of real, but limited, authorizations granted to him under a limited power of attorney and various account agreements. Issa issued hundreds of payment orders and checks to transfer millions of dollars internally and externally to his controlled accounts when those transfers had nothing to do with Weston purposes and clearly violated the limitations imposed by the POA and other agreements.

All told, there were hundreds of fraudulent transfers made by Issa from Weston accounts at JP Morgan to bank accounts held by Issa. The receiving account names were "mirror" accounts—with names deliberately chosen by Issa to look as if they were real Weston accounts.

Issa perpetrated the same scheme with Weston accounts at UBS, stealing at least $9 million.

In all, Issa directly embezzled over $60 million from the Westons' accounts at JP Morgan and UBS. (The number is greater than the loss number calculated by the FBI because: (1) Issa occasionally had to make Ponzi-type "repayments" of funds he had stolen from a Weston account back into that or another Weston account in order to conceal his fraud scheme; and (2) the original loss of about $5-6 million from the UBS scheme now turns out to be much higher).

Those direct-embezzlement losses are, incredibly, only a part of the massive fraud committed by Issa against the Westons. Others were even more depraved, as is explained below.

### ISSA PLEDGED THE WESTONS' FAMILY HOME IN WINNETKA FOR A LOAN FOR HIMSELF.

In August 2014, Issa took out a $2.9 million loan from Deutsche Bank, for his own purposes <u>and pledged Roger and Pam Weston's family home at ██████████ Winnetka, as collateral for the loan</u>. All the loan documents contained Weston signatures forged by Issa. Deutsche Bank is now suing the Westons to foreclose on their home. *DB Private Wealth Mortgage Ltd. v. Roger Weston Revocable Trust*, No. No. 2018 CH 11790 (Cook Cty). As the Court can well imagine, this fraud alone—mortgaging their personal residence out from under them and stealing the proceeds—has inflicted massive emotional pain and stress on the Westons.

### ISSA PLEDGED THE WESTONS' CONDOMINIUM UNITS AT ██████████ FOR A LOAN FOR HIMSELF.

In 2015, Issa fraudulently, and without the knowledge of the Westons, took out a $2.5 million loan in Roger Weston's name from First Midwest Bank and used the funds for his own purposes. To get the loan, Issa forged Mr. Weston's signature on the loan documents. Without the Westons' knowledge, Issa pledged as collateral for the loans <u>five condominium units and five garage condominium spots owned by the Westons</u>. Issa then misappropriated the proceeds for his own benefit. As a result of this fraud, the Westons are now defending themselves against a foreclosure lawsuit brought by First Midwest Bank. *First Midwest Bank v. Weston*, 2018 CH 1112 (Cook Cty).

### ISSA PLEDGED ROGER WESTON'S ART COLLECTION FOR A LOAN FOR HIMSELF.

In 2014, Issa fraudulently took out a $5 million loan from Emigrant Bank Fine Art Finance LLC and used the funds for his own purposes.

Issa had approached Mr. Weston about the possibility of getting a line of credit, supposedly to generate cash flow for Mr. Weston's benefit, secured by Mr. Weston's art collection. Mr. Weston considered the idea but ultimately rejected it when he learned that the bank was only

interested in a term loan, not a line of credit.  That did not deter Issa in the least.  He unilaterally took a term loan from the bank in the Westons' name by forging the Westons' signatures on the loan documents <u>and pledged the Westons' art collection</u> to the bank.  He took the money and immediately stole at least $2.1 million for himself.  He transferred another $400,000 to a UBS credit account from which he had by then stolen over $1,000,000.  Issa used another $1.3 million to cover Weston family expenses that could have been paid for by the Westons' cash that had already been stolen by Issa.  Issa transferred the remaining $1.2 million of loan proceeds to other accounts, and those funds have not yet proved conclusively traceable.

Issa never paid anything back on the Emigrant loan, and the Westons never knew there was a loan.  However, as a direct result of Issa's conduct, the Westons are now defending themselves in a suit brought against them by the bank seeking over $5 million and to foreclose on the art collection. *Emigrant Bank Fine Art Finance LLC v. River North Collections, et al.*, 2018 C 383 (N.D. Ill.).

### ISSA MISAPPROPRIATED AND PLEDGED STOCK THAT HAD BEEN <u>HELD IN THE WESTON FAMILY FOR DECADES.</u>

A substantial portion of the securities owned by Mr. Weston, his siblings and his entities had belonged to Mr. Weston's now-deceased parents since the 1940s. For example, as of 2007, Roger's father owned a massive number of shares in ███████████ that he began purchasing in the 1940s, most of which was later passed along to the family partnership, ████████ ███████. Similarly, as of 2007, Mr. Weston's Trust directly or indirectly held approximately 160,000 shares in ████████████████ a publicly traded company whose stock Mr. Weston first acquired in 1979, when a company of which he was CFO merged into ████ The stocks of ██████████████ (which spun off from ████ were the Weston family's legacy stocks.

Through the decades that various Weston family members or entities owned these stocks, they appreciated enormously in share value.  For example, between 2010 and 2017, ████ stock appreciated by more than 270% and ████ stock by 210%.   Mr. Weston and his siblings wanted to preserve the Weston family's legacy stock, a fact well known to Issa. Among other things: (a) this would allow it to be passed down to their children and future generations of the Weston family; (b) the legacy stock appreciated steadily and reliably in value; (c) their dividends grew consistently; and (d) the legacy stock carried a sentimental connection to the Weston family history.

Beginning in 2010, Issa, without the knowledge or authorization of the Westons, pledged $18 million in legacy stock to JP Morgan as collateral for a line of credit at the bank.  He did so using documents on which he forged Roger Weston's signature.  At times over the years, he proceeded to liquidate some of the legacy stocks to meet demands of JP Morgan on its line of credit.  Ultimately, most of the legacy stock was liquidated, causing massive future losses to the Westons.  Indeed, the Westons have <u>already sustained losses of over $70 million</u> from the loss of appreciation and dividends, and this amount is not even taken into account in Issa's sentencing guidelines calculations or the restitution agreed to in the plea agreement.

### Mr. Weston Loaned Issa $2.7 Million to Buy a House, and Issa Met This Act of Generosity by Forging Mr. Weston's Signature on <u>Documents Releasing the Mortgage Issa Had Signed in Favor of Mr. Weston.</u>

Yet another incomprehensible fraud relates to Issa's family home at ██████████, Hinsdale.  In March 2008, Roger Weston loaned Issa (through Issa's wife ████) $2.7 million to buy the 6,000 square-foot, 6-bedroom home, which was to be owned by Issa and his wife.  Issa caused [redacted] to execute a mortgage in favor of Mr. Weston, with the home serving as collateral.

Below is the email Issa sent to Mr. Weston to thank him, claiming Mr. Weston was a "father figure," that Issa was "forever grateful," and that "I love you."

Subject: **Boss...thank you for everything**
Date: 3/26/2008 4:48:39 PM Central Standard Time
From: ███████████████
To: ███████████████

Boss-

I cannot thank you enough for what you did for us today.,███████and I are still in a daze.   As you know, I grew up with out a father and I owe everything to my mom for raising five of us on her own.....I guess what I am trying to say is that you have been the closest thing to a father figure to me than anyone...from your day to day advice and teachings...from your advice on stock picks, to what the fed is going to do next , to how to pick window shades, house hunting, exotic foods, flying in small planes in storms, etc...well just in so many ways...

I know that we have known each other for a long time, but these past eight months have been amazing...for that, I am forever grateful, forever thankful,  forever in your debt and pray that one day God allows me the ability to return the favor to you and your family....

Once appraisal comes in , well visit █████and see what he could do for us...maybe he'll refi all my real estate holdings....you know I love real estate...and oh, ████████and I love you too!

Your CFO,
S

It was pure manipulation.  Issa's true "thanks" for Mr. Weston loaning him millions for his house <u>was to forge Mr. Weston's signature on multiple releases of the mortgage, and record those releases, without Mr. Weston's knowledge</u>. Issa recorded the first phony release less than four months later, on July 18, 2008.  In fact, Issa forged releases and then forged new, lesser mortgages on the property three more times in order to:  (a) allow him to re-pledge the property to unsuspecting third parties, and (b) fraudulently "reduce" his obligations to Roger Weston.

Then, on April 2, 2012, <u>Issa forged Roger Weston's signature on a complete and final release of the mortgage, releasing himself and his wife from the entire debt</u>.



All of these machinations were accomplished through an active fraud on Mr. Weston, with Issa providing fraudulent documents showing he was paying off the loan. In fact, he never paid a dime, and Mr. Weston is now owed about $6 million.

To make the fraud even worse, Issa and his wife pledged the same property on which he owed millions to Roger Weston to two other mortgage holders, who are now contesting the validity and priority of the Weston mortgage, embroiling Mr. Weston in yet more litigation. *Roger L. Weston Revocable Trust v. Issa, et al.*, 18 CH 07610 (Cook Cty.)

**ISSA USED THE STOLEN MONEY TO LIVE A BILLIONAIRE'S LIFESTYLE.**

A.    Luxury condominium at Big Sky Resort, Montana

Issa used proceeds of his fraud to buy a $5.5 million home at the Big Sky Ski Resort.

Below is a picture of that condominium property, known as Unit 12B Sunrise Ridge. This palatial

home is part of the highly exclusive Yellowstone Club. The club property spans 15,000 acres, and

Issa's neighbors and fellow members included Bill Gates, former Google CEO Eric Schmidt,

football star Tom Brady, and actress Jessica Biehl. https://www.dailymail.co.uk/news/article-5353663/Members-Yellowstone-Club-Montana-millionaires.html



B.    Vacation homes at El Dorado Beach and Golf Club, Cabo San Lucas,
Baja California del Sur, Mexico

Issa purchased four vacation properties at the exclusive El Dorado Beach and Golf Club in

Cabo San Lucas, Baja California del Sur, Mexico, with funds stolen from Mr. Weston and victim

RM. Other residents of the exclusive club include actor George Clooney and model Cindy

Crawford. https://leadingestates.com/lifestyle/el-dorado-the-golden-one-los-cabos-mexico/



Specifically, in late 2011 or early 2012, Issa made a down payment on Unit 336. In February, 2012, he terminated the contract on this unit and transferred the down payment to the purchase of Villa 358. In about February 2012, he bought Villa 358 for $3.75 million. (Issa sold the property in January 2017.)

Also in February 2012, Issa bought an ocean-front lot for $3.25 million. He sold that lot in November 2013, for approximately $4.25 million.

Then in May 2014, he bought Casita 324 for $2.1 million, which he later sold.

C.    Mansion at ▮▮▮▮▮▮, Hinsdale

As described above, in 2008, Issa purchased a house on ▮▮▮▮ Avenue in Hinsdale with a $2.7 million loan from Roger Weston, subsequently erasing his mortgage obligation by forging and recording a release. Apparently, that 6,000 square-foot, free-and-clear home was inadequate for Issa. Thus, in October 2012, while still retaining the ▮▮▮ Avenue property, Issa bought an old home located at ▮▮ ▮ St. in Hinsdale with funds stolen from Roger Weston. Issa knocked

down the home and started building the 14,000 square- foot mansion on the property. The finished version is depicted below.



.

The house was purchased and built with money stolen from Mr. Weston, plus a $4 million construction loan. When Issa's fraud was discovered, he signed over the property to Mr. Weston, along with the liability on the mortgage. Mr. Weston had to put in $973,000 to finish the home, pay property taxes, loan interest and other expenses prior to the home finally being sold in May 2020. The house sold for just under $4 million. The cost to purchase the property and build the house, substantially all borne by Mr. Weston, totaled $9 million.

    D.    <u>Vacation home on Lake Michigan</u>

Issa purchased a vacation home that fronted on Lake Michigan, ███████, Coloma, Michigan, on July 29, 2010. The property, which he subsequently sold, was worth <u>at least $2.3 million</u>. Below are photos of the house and the view of Lake Michigan from the house.





E.    <u>Issa's Dassault Falcon jets</u>

Issa purchased two private luxury jets with stolen funds.

First, in October 2013, Issa bought a 1985 Falcon 50, serial # HN50 for well over a million

dollars.  This jet model is of a type owned by the air forces of more than a dozen sovereign nations.

https://en.wikipedia.org/wiki/Dassault_Falcon_50.    He sold the plane in 2014.

Then, on April 15, 2014, Issa purchased a 1999 Dassault Falcon 2000 jet, tail number N2000L, mfr. serial no. 19 for <u>$7.95 million</u>. The plane is a wide-body, 10-seat jet with capacity to travel 3,700 miles without refueling. The Falcon 2000 is part of the military fleet of a number of countries, including France and Japan. He bought the jet in the name of his company ORHI 2000, which was owned by his living trust and his company Falcon Capital Ventures, Inc. (an Illinois corporation). He bought the airplane with a combination of cash stolen from Mr. Weston and a $6 million loan from Commerce Bank in St. Louis. Issa's jet, tail number N2000L, and the description of the jet from the loan agreement, are pictured below.



EXHIBIT A
TO
AIRCRAFT MORTGAGE AND
SECURITY AGREEMENT

AIRCRAFT DESCRIPTION

AIRFRAME: One (1) Dassault Aviation aircraft model Falcon 2000 (identified on the International Registry drop down menu as Falcon model 2000), aircraft bearing manufacturer's serial number 109 and United States Registration Number N2000L.

ENGINE: Two (2) CFE Company, model CFE 738-1-1B having manufacturer's serial numbers P105434 and P105380 (identified on the International Registry drop down menu as CFE model CFE738 SERIES with serial numbers 105434 and 105380).

Issa defaulted on the loan and his guarantee, and in 2017 was sued in federal court in St. Louis by the note-holder, Central Bank of St. Louis. See *Central Bank of St. Louis v. ORHI 2000 et al.*, 4:17-cv-00262-DDN (E.D. Mo.). That case was settled, but Issa subsequently defaulted on the settlement agreement, because by that time Mr. Weston had discovered Issa's fraud and cut him off from access to the Westons' assets. In a second suit in St. Louis, a federal judge then entered a default judgment against Issa for about $3,000,000 in case number 4:18-cv-00058 AGF (E.D. Mo.).

F.      Issa's yachts

Issa has apparently confessed to having purchased no fewer than four yachts with the proceeds of the fraud against the Westons. We have been unable to acquire prices or identifying information regarding the yachts, although we believe that the U.S. Attorney will be able to furnish it to the Court.

G.      Condos in Trump Tower and other real estate

Issa used proceeds of the fraud to purchase three condominiums in Trump Tower. All told, according to the criminal information, Issa accumulated 25 real properties with proceeds of the fraud.

H.      Global Luxury Imports

Issa purchased a luxury car dealership specializing in vehicles like Lamborghinis and Rolls Royces and financed his purchase of those cars with over $10 million in funds he stole from Mr. Weston and other victims. For Father's Day 2014, Issa made an unsolicited "gift" of a Rolls Royce from the dealership to Roger Weston for his use for a week. Issa, of course, never mentioned that he had used funds stolen from Mr. Weston to finance the car—and to buy the

dealership itself. Mr. Weston did not use the faux gift because it was far too ostentatious. Issa's crimes involving Global are further detailed below.

### WHEN MR. WESTON DISCOVERED THE FRAUD, ISSA ATTEMPTED TO EXCUSE HIS CONDUCT, PRETENDED TO "COOPERATE" AND ATTEMPTED TO EVADE RESPONSIBILITY, ALL WHILE COMMITTING NEW CRIMES.

In late September 2017, Roger Weston first began to receive indications that Issa had embezzled funds. On or about October 4, 2017, Mr. Weston confronted Issa, and Issa confessed to some of the scheme, although without revealing the scope or many of the facts that have since emerged. He offered a non-apology and more deception. Issa told Mr. Weston that he had "failed" Mr. Weston, that Issa "swore on his father's grave" that he thought that "everything he did at the time was right," and begged Mr. Weston "not to take his children away." Issa also claimed that the whole thing was JP Morgan's[1] fault because "they let me do it." Issa, the consummate narcissist, cried and cried, begged for forgiveness and promised to work for the rest of his life to repay the stolen money.

Issa's October 4 charade was typical of his fundamental character and of his failure throughout to accept responsibility. He could not possibly have thought that he was doing "everything right" when he embezzled tens of millions of dollars from Mr. Weston and many millions more from others so that he could rub elbows with sports stars, super-models and Silicon Valley royalty. His characterization of "failing" Mr. Weston ludicrously suggested that it was all just a mistake, and his pitiful appeal to his "father's grave" and his children were just more examples of the pattern and practice of emotional manipulation he used to get what he wanted from his victims.

---

[1] Although the Westons have filed suits against JPMorgan and UBS, the banks' liability for their breaches of duties owed to the Westons do not relieve or lessen Issa's responsibility for his crimes. Likewise, Issa's crimes do not relieve or lessen the banks' liabilities for the breach of their duties to the Westons.

On October 13, 2017, he signed a Cooperation Agreement with Roger and Pam Weston which he immediately proceeded to dishonor. In it, Issa agreed to provide complete and truthful information about the crimes, including agreeing to:

> (i) identify the origin and amount of the Embezzled Assets, (ii) recount to Weston and Weston's representatives each of his actions (or the actions of others acting under his direction or employment) in connection with the Embezzlement and subsequent thereto with respect to any Embezzled Assets, and (iii) cooperate in all respects with the Weston Group to provide any other information, materials, documents or records requested by the Weston Group in their sole discretion in connection with the Embezzlement, the Embezzled Assets, or any matter in connection thereto, including, but not limited to (x) providing detailed explanations of his actions with respect to the Embezzlement; (y) making available records, documents and other information (including bank account, investment account and credit card statements or similar account information, wherever located); and (z) providing the names and contact information of any third party with whom he interacted in connection with the Embezzlement or the Embezzled Assets. Sultan shall provide such cooperation at his sole expense.

Issa also promised that he and his wife ▮▮▮▮ would:

> cooperate with the Weston Group and its representatives in connection therewith, including, but not limited to making themselves available, providing testimony and granting access to any books, records and other information as may be requested by such member of the Weston Group, at the sole cost and expense of Sultan or ▮▮▮▮, as the case may be.

And Issa promised that he and his wife would transfer all embezzled money and property titles back to the Westons.

Issa is, however, a sociopath, and ended up respecting this contract no more than he had his fiduciary duties in the first place. He promptly stopped cooperating. He has refused to answer questions both about the details of the offenses and the location of assets. He has never voluntarily provided Mr. Weston any of his bank records. Even though Issa granted Mr. Weston power of attorney to obtain records from some of Issa's banks, Issa blocked access to the bank information and refused to sign waivers in a form required by the banks. He has refused to convey title to

properties acquired through his fraud scheme. Instead, he continued to lie, cheat and steal. And worst of all, he committed new frauds against Mr. Weston and others, even while insisting to Mr. Weston's representatives on his "father's grave" that he would "always answer truthfully."

**AFTER SIGNING THE COOPERATION AGREEMENT, ISSA CONTINUED COMMITTING NEW FRAUDS AGAINST MR. WESTON AND OTHER VICTIMS AND FRAUDULENTLY DEPLETED ASSETS AVAILABLE TO MAKE RESTITUTION.**

Even after signing the Cooperation Agreement, Issa committed new frauds against the Westons and other victims and deliberately depleted assets available to make restitution.[2][3]

1.  The continuation of the Global Luxury Imports fraud scheme

Prior to September 2017, Issa had used $6.3 million in funds embezzled from Roger Weston, plus funds he obtained by fraud from several unrelated individual investors, to purchase a luxury used-car dealership in Burr Ridge called Global Luxury Imports. Among the other investors were: (a) Issa's own sister, who contributed about $2.3 million, (b) the RMs, an elderly couple who live in the Southwest, who contributed $1 million; and (c) two professional athletes, who put in a total of $3 million based on Issa's representation to the athletes that they were investing in a hedge fund, not a car dealership.

Issa's frauds continued after the discovery of his embezzlement. After he was caught, Issa tendered an assignment of Global to Mr. Weston. When Mr. Weston's professionals examined the books, they learned two facts: (a) the company was bankrupt; and (b) Issa's parting shot was

---

[2] Issa failed to disclose at least two dozen bank accounts or investments in his name or the name of his wife or affiliates, that were later discovered through investigation. There is good reason to believe that many more remain undiscovered.

[3] Issa also titled stolen Weston assets in ways that have made it far more difficult for Mr. Weston to recover them. For instance, Issa used $500,000 to $600,000 in stolen funds to create trusts for his children, with his wife ▮▮▮▮ as the trustee. After Issa was caught, these funds were drawn down to $400,000 without Mr. Weston's knowledge or permission, and ▮▮▮▮ subsequently used the remainder to buy a house as trustee for the benefit of their children at ▮▮▮▮ Lane, Hinsdale. Mr. Weston is now suing ▮▮▮▮ for return of the funds. In their recent divorce hearing, where the judge granted this home to ▮▮▮▮ as trustee pursuant to a settlement agreement, Issa and ▮▮▮▮ told the judge that the house belonged to the children without disclosing that funds to buy the home had been embezzled by Issa from Roger Weston.

to embezzle even more money from Global even after he had admitted the embezzlement from the Weston bank accounts. <u>In fact, exactly six days after he confessed to Mr. Weston, he fraudulently transferred $50,500 to himself from Global Luxury Imports</u>, which money belonged to Mr. Weston, Issa's sister, the RMs and the professional athletes. Issa followed up by stealing another $17,000 from the dealership days after he signed his Cooperation Agreement with Mr. Weston.



He then proceeded to ensure that the losses would fall chiefly on Mr. Weston and the RMs. First, he apparently used proceeds from another fraud, relating to a Sterling Capital investment (see below), to partially pay back his sister. Next, lawyers for the athletes found out about the fraud against their clients. In violation of his Cooperation Agreement and knowing that he was the target of a federal investigation, Issa repaid the athletes a large chunk of the money they contributed <u>using money he had stolen from Roger Weston</u>. Because Issa had run the athletes' "contributions" through Weston-owned accounts or titled the hedge funds similarly to a legitimate Weston vehicle, the athletes also threatened to sue Mr. Weston. Although Mr. Weston was totally unaware of Issa's fraud and did not benefit from it, Mr. Weston ended up settling with the athletes for a substantial amount in order to avoid paying for even more litigation.

2.  New fraud directed against the RMs.[4]

The RMs are a retired couple in their 80s who live in the southwestern United States and do not wish to be specifically identified.  In addition to conning them out of $1 million for the Global Luxury Imports business, Issa stole another $500,000 that went to purchasing one of the properties at El Dorado Beach and Golf in Cabo San Lucas.

His cons against the RMs employed the same artifice as that used against the Westons—that they were "family."   An email exchange from 2012 was typical of Issa's methodology, promising returns of small portions of their capital that seldom or never came, telling them that he was "proud and honored" to be their "partner," and assuring the RMs that he "loved" them.

From: "Sultan S. Issa CPA MST" ▮▮▮▮▮▮▮▮▮▮▮
Date: August 31, 2012 at 7:58:27 AM MST
To: ▮▮▮▮▮▮▮▮▮▮▮
Subject: Re: ▮▮▮▮ Family Partnership K-1

Ok sounds good. Also i will be wiring about $12,000 into ur acct from various deals u have with me. I am grateful and proud and honored to call you my Partner

I love you guys!!

Sultan S. Issa, CPA MST

Indeed, Issa convinced the RMs to invest in the Cabo San Lucas property so that the RMs and the Issas (forty years their junior) could enjoy it by vacationing together.  Of course, the RMs never saw, much less used the condo, and the RMs lost all the money they put into Global and the beach condo.

Incredibly, in March 2018, many months after Issa had confessed to Roger Weston, and after he was aware that he was the target of a federal grand jury investigation, Issa contacted the

---

[4] This section is based on documents and a personal interview conducted by Chris Gair of the RMs on January 5, 2019.  It is supported by an affidavit of Mr. Gair that can be provided to the Court under seal if the Court so requests.

RMs begging them to give him yet another $1.5 million. Issa said that he desperately needed the money to complete the construction of the mansion he was building in Hinsdale and to repay his father-in-law, who he claimed had previously loaned him money and was threatening to "ruin his reputation in Hinsdale." He did not mention that he was the target of a federal fraud investigation.

During the phone conversation, Issa was crying and begging for the money. He swore (as he did to Mr. Weston in October 2017) on his "father's grave" and on "his children's lives" that he would pay them back (even though he had not returned the other funds they had provided him).

Issa's statements concerning the need for money to finish the Hinsdale home were utterly fabricated. By March 2018, Issa had already transferred his interest in the home to Mr. Weston (which ultimately caused Mr. Weston further losses, as described below), and Issa had no further interest in the home. Nor is there any evidence that Issa's father-in-law provided any funding for the construction of the home.

The RMs also asked Issa during the phone conversation how the car dealership they had invested $1 million in was doing. Issa told them that the "business was doing well" and that there "will be a nice return now." This statement was a demonstrable lie. Issa had already tendered the business to Mr. Weston, who rejected the tender because it was bankrupt. It was also closed.

But Issa had chosen his victims well, and had devoted years to seducing them and grooming them for more frauds. They had great difficulty rejecting his pleas. They asked him to give back some of the money they had already invested. Issa proceeded to send them two $10,000 checks. One of the checks bounced. Mr. RM then contacted Issa to find out why. Issa replied, on Marcy 7, 2018, with yet another lie:

Begin forwarded message:

**From:** "Sultan S Issa, CPA, MST" ██████████
**Date:** March 7, 2018 at 11:52:56 AM MST
**To:** ███████████████████████████
**Subject: Mailing new from new acct now**

Sorry ███
Had to open up new acct due to identity theft. The new acct number ends in 9589
and I used wrong checkbook. Mailing new one now!
S

Issa did not have to open a new account "due to identity theft," and he did not use the "wrong" checkbook. These were deliberate lies made by Issa in the hope of lulling the RMs and extracting even more money from them.

    3.  <u>The Sterling Capital Investment</u>

Prior to his crimes being discovered, Issa had used $500,000 of stolen funds to purchase a private equity investment in Sterling Capital. On October 1, 2018, <u>nearly 12 months after the discovery of his fraud</u>, Issa transferred his interest in the Sterling Capital account to the living trust of his sister ██████. None of the funds has been returned to Mr. Weston.

    4.  <u>The US Fiduciary Services IRA</u>

At the time he executed the Cooperation Agreement, Issa held $216,000 in a 401(k) at U.S. Fiduciary Services Retirement Plan. After execution of the Cooperation Agreement, Sultan surreptitiously took a $50,000 loan against the balance, so the remaining account amounted to approximately $166,000. Demand was made for turnover of the balance of the 401(k) account to Mr. Weston but no turnover has ever been made. Instead, on June 30, 2020, Issa and his wife ██████ obtained the approval of a judge in their divorce proceeding for Issa to turn half of this amount over to ██████ and keep the other half for himself. No one revealed to the Court that the funds were obtained by a fraud perpetrated on Mr. Weston in the first place.

5. <u>Issa's Refusal to Return $500,000 in jewelry</u>

Issa confessed to Roger Weston that he had used $500,000 of money stolen from Roger to purchase valuable items of jewelry for his wife, ██████. He identified specific items to Mr. Westons' lawyers. However, when the Westons' lawyers tried to recover the items, the Issas offered a variety of inconsistent and implausible stories. Issa claimed that ██████ and her brother ██████ had them. ██████ claimed that she "lost" all of them. She also claimed at some later point that she had "found" the items.

And that was not all. On or about February 8, 2018 (long after he was supposedly cooperating to return assets) Issa sent the following text and photo to two close associates of Roger Weston at the Weston family office, wildly claiming that the previous day his brother-in-law and business partner ██████ had beaten him up and put him in the hospital for having sought the return of the jewelry.

The point of the photo and the narrative was to further manipulate Roger Weston, to make Mr. Weston and his colleagues feel sorry for him, and most importantly to deter Mr. Weston from further trying to recover the jewelry or any other assets Issa had stolen. As Issa explained: "Roger is wasting his time and money searching for assets as there are none."



6. <u>Issa's home at</u> ███████ <u>in Hinsdale</u>

Despite signing the Cooperation Agreement in October 2017, Sultan has refused to sign corrective affidavits to reverse the forged releases or to sign consent foreclosure documents on the Hinsdale home he purchased with a $2.7 million loan from Roger Weston. We respectfully suggest that the Court may want to inquire directly of Issa at sentencing why he has flouted his promises and refuses to sign a document reversing the forged releases. In advance of sentencing, we have provided Issa's counsel the appropriate legal documents for Issa's signature.

Even that, however, does not tell the full story. To add insult to great injury, Issa has continued living in this home, purchased with Roger Weston's money, for the past 2 ½ years while the U.S. Attorney and the FBI worked on the case. Below is a photograph of the house.



7.  <u>Issa's Star Wars collection</u>

Issa has been collecting Star Wars memorabilia for many years.  In early December 2017, as part of his "cooperation" with Mr. Weston, he revealed to Mr. Weston that he held about 2,700 pieces with an appraised value of $180,000 and provided an inventory.  Mr. Weston's brother-in-law, █████████, offered to help Mr. Weston recover the items and sell them at auction.  Issa again swore on his "father's grave" to assist and tell them the truth about everything.

**From:** Sultan S Issa, CPA, MST ████████████████
**Sent:** Thursday, December 7, 2017 3:29 PM
**To:** ██████████
**Subject:** Re: Property List

*Anytime...H, please feel free and confident to ask me any questions you may have...I will always answer truthfully...I swear on my Father's grave...Please allow me to help in any way that I can...*
*S*

This was another lie, followed by yet another betrayal.  When Issa turned the collection over, most of the valuable high-end pieces were missing.  He has failed to account for the missing inventory.  When the pieces he did turn over were finally sold at auction, Mr. Weston received

$31,000, but since he spent $40,000 on the fees and expenses of the auction, Mr. Weston actually lost $9,000 as a result of Issa's feigned cooperation and actual obstruction.

8. BBVA Compass loan

On November 20, 2017, a full month after he had promised to turn all his assets over to the Westons pursuant to the Cooperation Agreement, Issa somehow obtained a $2,000,000 unsecured loan from BBVA Compass Bank. Given his admitted embezzlement of tens of millions from the Westons, Issa knew that his application for that loan was fraudulent.

9. Continued fraud involving Furrs Capital Midwest into late 2019

One of Issa's many frauds involved a series of LLCs that owned 25 Furrs Cafeteria restaurants. The parent company that directly owned the restaurants was Alamo Furrs LLC ("Alamo"). River North Furrs LLC ("River North"), managed by another Weston associate, owned 20% of Alamo. In turn, a company organized by Sultan Issa, Midwest Furrs LLC ("Midwest"), owned 14.286% of River North.

Issa had falsely represented to River North that Issa was the sole owner of Midwest. In fact, he had—in violation of the applicable operating agreement—secretly resold his interests to another group of investors. Issa defrauded these investors by obtaining contributions from them far in excess of the total capital contribution Midwest had made to River North. This part of the fraud occurred before Issa's fraud against the Westons was discovered.

As part of his "cooperation" with Roger Weston, Issa tried to assign his interest in Midwest to Mr. Weston. Mr. Weston's professional team discovered the existence of Issa's investors and that Issa had duped them. Mr. Weston thus rejected the assignment of Midwest. Issa's attempt to pass off Midwest to Mr. Weston as something Issa owned, when it was actually owned by investors he had duped, was yet another fraud and one that occurred after he was supposedly cooperating.

27

Issa's fraud did not, however, end there. In 2019, Issa owed his Midwest "investors" a 2018 K-1 relating to their investments in Midwest. On September 11, 2019, Issa asked his attorney, ███████, to contact the manager of River North, ███████, because "Mr. Issa is trying to obtain Furrs Capital Midwest's K-1 for River North Furrs. He needs this to complete his tax filings. Please send by email ASAP." Mr. ████ was fully transparent and copied both counsel for the Westons and the AUSA on this request. However, Issa had clearly tricked Mr. ████ as well, because it was Issa, not ████, who was responsible for preparing the Midwest K-1s.

███████, who had nothing to do with Midwest, could not create or provide a Midwest K-1. However, what he could and did provide to Mr. ████ was a K-1 issued by the ultimate parent, Alamo, to River North that showed that the overall River North investment had declined



during the year by 8.7%.

Because Midwest was a shareholder in River North, its capital account could only have declined by this same amount, 8.7%.  However, Issa, attempting to conceal his original fraud on his investors, prepared a K-1 for his investors showing that the investment had declined by 67.4%.



Issa sent this phony K-1 to investor NG in late 2019. This, of course, was yet another blatant fraud. There was simply no way for the account of an investor in Midwest to have declined by two-thirds when River North's capital declined by less than 10%.

### TO CREDIT ISSA WITH ACCEPTANCE OF RESPONSIBILITY IN THESE CIRCUMSTANCES WOULD CONSTITUTE A MOCKERY OF THE CONCEPT EMBODIED IN U.S.S.G. § 3E1.1.

In Issa's plea agreement the Government and the defendant preliminarily agreed that Issa had accepted responsibility for his crime and should receive a three-level reduction under Guideline § 3E1.1. In light of the evidence presented above, the only possible conclusion is that Issa has not accepted responsibility at all, and has done everything possible to thwart recovery of assets and to commit new crimes.

If Issa had accepted responsibility, why did he make fraudulent transfers of assets to his wife, sister and others, even as he proffered to the government? Why did he steal $67,000 out of Global's bank account? Why did he categorically refuse to sign documents showing that Mr. Weston had the first mortgage on Issa's Hinsdale house? Why didn't he give back the jewelry? Why did he refuse to provide bank records of his personal accounts that would have allowed tracing of funds? Why did he steal most of the valuable Star Wars collection? Why did he try to trick the RMs into giving him another $1.5 million that he knew he could never repay? Why did he defraud BBVA Compass into giving him $2 million when he had no possibility of ever repaying it? Why did he create a fraudulent K-1 for investors in Midwest in the fall of 2019?

The Weston victims respectfully submit that this is not even a close call on acceptance of responsibility. Pleading guilty and mouthing a form of words is not enough. *United States v. Panadero*, 7 F.3d 691, 694 (7th Cir. 1993). As Application Note 3 explains:

> Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct

for which he is accountable under §1B1.3 (Relevant Conduct) (see Application Note 1(A)), will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a). <u>However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.</u> USSG §3E1.1 (emphasis added).

"Whether a defendant has accepted responsibility is a factual finding that depends primarily on credibility assessments." *Panadero*, 7 F.3d at 694 (citing *United States v. McKenzie*, 922 F.2d 1323, 1329 (7th Cir. 1991)).

The courts routinely deny credit for acceptance of responsibility in circumstances like those at issue here. For instance, in *Panadero* the defendant had embezzled a substantial sum from her employer, forged documents and altered records. While on pretrial release, she engaged in check kiting and submitted a falsified home mortgage application to a bank. The district judge found that the defendant's acceptance of responsibility was insincere. *Id*. at 694. Although Panadero pled guilty, she "represent[ed] a paradigm case of someone who pleads guilty but does not accept personal responsibility for her own acts in a moral sense." *Id*. at 694. The court of appeals agreed with the district court's conclusion that Panadero had accepted responsibility only in order to reduce her sentence, rather than expressing actual remorse. *Id*.

*United States v. DeCecco*, 467 Fed. Appx. 85, 86 (2nd Cir. 2012), reached the same result. There the defendant embezzled $2.5 million from his employer while he served as its controller. He was denied acceptance of responsibility because he lied to government agents and hid various assets to prevent forfeiture. *Id*. at 87. The court concluded that although he might have admitted his wrongdoing, DeCecco "sought to continue supporting himself and his family with somebody else's money," and thus had not truly accepted responsibility. *Id*. (original internal quotations omitted.) The Second Circuit found this "an entirely reasonable basis" on which to deny acceptance of responsibility credit. *Id*.

Indeed, the failure to do everything possible to make the victim whole is itself evidence of a failure of acceptance of responsibility. In *United States v. Lenz*, 623 Fed. Appx. 526, 527 (11th Cir. 2015), the defendant embezzled $2.3 million gained from his illegal activity to buy a home in Michigan and otherwise fund his lifestyle. *Id*. On appeal, Lenz challenged the district court's decision to deny him acceptance of responsibility. Although Lenz was willing to give some of the money back, the district court emphasized that Lenz lacked sincerity since he did not do everything possible to make his victims whole. The Eleventh Circuit concluded that even though Lenz cooperated with authorities to some extent, the district court did not err in denying him acceptance of responsibility. *Id*.; see also *United States v. Hatton*, 360 Fed. Appx. 718, 719 (8th Cir. 2010) (defrauding another victim after pleading guilty to defrauding defendant's mother sufficient to deny acceptance credit).

Both common sense and these authorities demonstrate that Issa has not accepted any responsibility, much less "clearly manifested" that acceptance. Issa continued to commit frauds against Mr. Weston, the RMs, BBVA Compass Bank, and the Furrs Midwest investors after he was caught and had confessed to the principal fraud scheme. He refused to provide information and documents necessary to recapture assets. He continued to live off the wealth he had stolen.

It is therefore not surprising that when confronted by Mr. Weston in the fall of 2017, Issa insisted that the scheme was entirely JP Morgan's fault because "they let me do it." "[B]laming someone else for one's own actions or minimizing one's involvement in the offense is not the sort of genuine contrition the acceptance of responsibility reduction seeks to reward." *United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010). Issa's faux "acceptance of responsibility" is nothing more than a form of words in the plea agreement that has no connection to reality. While it is understandable that the government was willing to make this preliminary representation as part of

the plea negotiations, the government did not have the full information at the time it did so, and Issa's "acceptance" was completely phony. As a result, his offense level should be 41, not the 38 suggested in the plea agreement. His sentencing range should therefore be 324 to 405 months, that is, 27 years to 33.75 years in prison.

## IMPACT ON THE VICTIMS

Roger, Pam, Cynthia and Randall Weston will address the Court directly at the sentencing to describe the devastating financial, emotional and psychological effects of Issa's fraud. They have also provided outlines of the impact on each of them to U.S. Probation. Any lawyer's summary could not possibly do justice to what has happened to them. Their lives are devastated. Cynthia's and Randall's plans for retirement and peace of mind have been destroyed. They each have had to sell their homes and move. Roger and Pam Weston have been betrayed, lost much of what they had, and can look forward to spending the rest of their lives absorbing the fallout in litigation. They have already been forced to spend ███████████ on lawyers, experts, and consultants through July 15, 2020, and will spend many millions more. Roger Weston, the hardest hit, cannot stop thinking about what happened, and it has ruined what should have been happy years in the twilight of his life.

## SENTENCING RECOMMENDATION

The defendant here is a sociopath. He will offend again, on the same grotesque scale, as soon as he is released from prison. That is who he is. There is no hope for redemption, only punishment and deterrence. Based on all the evidence in this case, the victims respectfully submit that Issa should be sentenced to the maximum sentence available, 30 years imprisonment. This is, notably, right in the middle of his properly-calculated guideline range.

Dated: July 31, 2020                        Respectfully submitted,

                                            /s/ Chris Gair
                                            Chris C. Gair (ARDC # 6190781)
                                            Gair Eberhard Nelson Dedinas, Ltd.
                                            One East Wacker Drive, Suite 2600
                                            Chicago, Illinois 60601
                                            (312) 600-4900
                                            cgair@gairlawgroup.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that on July 31, 2020, he caused a copy of the foregoing document to be filed under seal via this Court's CM/ECF system pursuant to the Court's order, and provided courtesy copies via email to counsel for the government, Phillip Fluhr, counsel for the defendant, Daniel Collins, and U.S. Probation Officer Melissa Ray.


/s/ Chris Gair
Chris Gair